**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joan W. Brown, | No. CV-09-2272-PHX-GMS |
| Plaintiff, | **ORDER** |
| vs. | |
| State of Arizona and the County of Maricopa, Arizona, | |
| Defendants. | |

Pending before the Court is a Motion for Summary Judgment filed by Defendant Maricopa County (Doc. 59) and a Motion for Summary Judgment filed by Defendant State of Arizona (Doc. 62).[1] For the following reasons, the Court denies the County's Motion and grants in part and denies in part the State's Motion.

## BACKGROUND

The facts are generally undisputed. Plaintiff Joan W. Brown was employed by the Superior Court of Arizona in Maricopa County (commonly referred to as Maricopa County Superior Court ("MCSC")) as a public information officer starting in November 1996. (Doc. 61 at ¶ 1–2; Doc. 69 at ¶ 1–2). She was later transferred from the juvenile court probation

---

[1] Plaintiff's request for oral argument is denied, as the written briefing provides a sufficient basis upon which this Court can dispose of the Motions. *See Lake at Las Vegas Investors Grp. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 728–29 (9th Cir. 1991).

office to Superior Court Administration and promoted to Communications Director. (Doc. 61 at ¶ 3–4). On December 16, 2005, Plaintiff received official notice of a disciplinary charge for her failure "to respond in an appropriate, professional or timely manner to numerous assignments from the Presiding Judge." (*Id.* at ¶ 6–8). Following a pre-disciplinary hearing on January 25, 2006, Court Administrator Marcus Reinkensmeyer demoted Plaintiff to the position of Media Relations Director. (*Id.* at ¶ 9–11). Shortly thereafter, her immediate supervisor became Jessica Funkhouser. (*Id.* at ¶ 12, 14–15).

Plaintiff's job performance, as measured by a performance evaluation for the year ending June 30, 2006, was noted as "Unacceptable" in multiple areas and overall as "Marginal." (*Id.* at ¶ 16–17). Her performance improved the following period (for the year ending March 14, 2007), where her overall evaluation noted that she "Meets" expectations. (*Id.* at ¶ 20). On May 21, 2007, Plaintiff and Ms. Funkhouser signed an "Annual Goals" memo setting forth performance objectives for the next year. (*Id.* at ¶ 23). Plaintiff did not fulfill many of these goals or other job responsibilities, *see id.* at ¶ 24–32, and her performance evaluation for the year ending June 30, 2008, was an overall "Marginal" with many ratings of "Unacceptable" in specific areas. (*Id.* at ¶ 36–37). On June 13, 2008, Plaintiff received official notice charging her with failure "to meet the minimum performance standards required of [her] position as Media Relations Director." (*Id.* at ¶ 41–42). A pre-disciplinary meeting with Mr. Reinkensmeyer was scheduled for June 20, 2008. (*Id.* at ¶ 44).

Plaintiff did not attend that meeting, however, as on the same date she began leave under the Family and Medical Leave Act ("FMLA"). (*Id.* at ¶ 67). Plaintiff argues that she was diagnosed with depression as early as 2003 and additionally suffers from panic attacks and anxiety. (Doc. 69, Ex. A at 44; Doc. 69, Ex. B at 69). From these mental health issues, she contends she lost her ability to concentrate at work, leading to her performance problems. (Doc. 69, Ex. A at 146; *see also* Doc. 69, Ex. B at 78–79). On September 9, 2008, Dr. Klein, the primary care physician under whose care Plaintiff had been since 1999, cleared her for return to work on September 12, 2008, on light duty. (Doc. 61 at ¶ 81–82). Meanwhile, MCSC Human Resources Director Phillip Hanley sent Plaintiff a letter dated September 11,

2008, informing her that he had received her release to return to work and that she would be placed on administrative leave with pay. (*Id.* at ¶ 47–48; Doc. 61, Ex. O). Plaintiff subsequently attended a rescheduled pre-disciplinary meeting on September 17, 2008, and was dismissed from her position as Media Relations Director two days later. (Doc. 61 at ¶ 49–50).

Just before her termination, on September 15, 2008, Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination against MCSC, claiming that "[b]ased on my disability and the [c]ourt's refusal to try to accommodate me, my work performance started to suffer." (*Id.* at ¶ 141–43; Doc. 61, Ex. DD). The EEOC issued Plaintiff a Right to Sue Letter on August 10, 2009. (Doc. 1 at ¶ 21). She filed suit in this Court on October 29, 2009, against the State of Arizona (the "State"), alleging that as the operator of MCSC, it violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act by its discriminatory termination of her employment and its failure to reasonably accommodate her disability. *See* Doc. 1. Plaintiff further names Maricopa County (the "County") as a defendant, arguing that it is her joint employer. Both Defendants seek summary judgment–the County, on its assertion that it does not employ Plaintiff (Doc. 59), and the State, on all of Plaintiff's substantive claims under both Acts (Doc. 62).

**DISCUSSION**

**I. Legal Standard**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at 248). When the nonmoving party "bear[s] the burden of

1 proof at trial as to an element essential to its case, and that party fails to make a showing
2 sufficient to establish a genuine dispute of fact with respect to the existence of that element,
3 then summary judgment is appropriate." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan*
4 *Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477
5 U.S. 317, 322–23 (1986)).

## II. Analysis

### A. Defendant Maricopa County's Motion for Summary Judgment

The sole issue raised in the County's Motion is whether there is sufficient admissible evidence in the record to raise a fact issue as to whether the County is Plaintiff's joint employer. The Ninth Circuit has applied an "economic reality" test to determine the existence of a joint employment relationship. *Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir. 1997) (citing *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)). "[A]ll factors 'relevant to the particular situation'" must be considered "in evaluating the 'economic reality' of an alleged joint employment relationship." *Moreau v. Air Fr.*, 356 F.3d 942, 947 (9th Cir. 2004) (quoting *Torres-Lopez*, 111 F.3d at 639 (quoting *Bonnette*, 704 F.2d at 1470)).

*Torres-Lopez* set out a non-exhaustive list of such factors to be considered in the Fair Labor Standards Act ("FLSA") context. *See* 111 F.3d at 639–641. In noting that no previous reported decision addressed joint employment in the FMLA context, *see* 356 F.3d at 946, *Moreau* then applied the *Torres-Lopez* framework to a FMLA claim, considering five factors in particular: "(A) The nature and degree of control of the workers; (B) The degree of supervision, direct or indirect, of the work; (C) The power to determine the pay rates [or] the methods of payment of the workers; (D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and (E) Preparation of payroll and the payment of wages." *Id.* at 947. Because there are no reported cases of this Circuit holding that there is a distinction between joint employment in the FLSA and FMLA contexts and joint employment under anti-discrimination statutes like the ADA and Rehabilitation Act,

the Court will apply the same legal framework here.² In light of this broad and non-exhaustive multi-factored test, the Court earlier denied the County's motion to dismiss on this very issue until the factual record could be developed further. *See* this Court's Order of January 28, 2010, Doc. 19 at 2 ("[T]he question of whether a plaintiff was jointly employed by two employers . . . is typically addressed on summary judgment after the plaintiff has had the opportunity of conducting discovery."). Now that discovery is complete, Defendant at the least cannot demonstrate the lack of issues of material fact regarding the extent of the County's control over Plaintiff's employment.

In its Response to the County's Motion, Plaintiff points to various factors weighing in favor of the existence of a joint employment relationship. The Court will not address all of these contentions, but will instead focus on particular interrelationships between the County and MCSC which suggest the County's control over Plaintiff's employ.

First, Plaintiff argues that her job performance was evaluated based upon her compliance with the County's expectations and policies. *See* Doc. 67 at 5. Criteria on the performance evaluation form include, among others, "[t]he level that an employee understands and follows *Board of Supervisor*, *County administrative* and departmental policies and procedures" and "[t]he quality level of work performed which meets *County*, departmental and supervisor expectations." (Doc. 68, Ex. H (emphasis added)). Courts have

---

² The Ninth Circuit did cite these factors with approval in a published Title VII case. *See EEOC v. Pac. Maritime Ass'n*, 351 F.3d 1270, 1275 (9th Cir. 2003). The joint employer doctrine applies in the same manner across Title VII, Age Discrimination in Employment Act, and ADA claims. *See Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 449 n.7 (2003). The Rehabilitation Act, in turn, provides that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 . . . ." 29 U.S.C. § 794(d). However, the opinion in *Pacific Maritime* appears to have been withdrawn ahead of a rehearing en banc. *See* 367 F.3d 1167 (9th Cir. 2004). Following the parties' stipulation to a dismissal ahead of that rehearing, however, the Ninth Circuit never vacated its prior order or reinstated the opinion of the three-judge panel. Accordingly, this Court does not treat *Pacific Maritime* as binding precedent, though any persuasive value it may have does support the Court's analysis here.

recognized that provision of human resources support to realize economies of scale, oftentimes occurring when the purported joint employer's name appears on various employment-related documents, does not in itself create a joint employment relationship. *Cf. Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979) ("Economic realities, not contractual labels, determine employment status . . . .").

Nevertheless, the County provides no reason to believe that Plaintiff's supervisor did not rate Plaintiff's performance in part by using the evaluative County criteria placed in the form. The criteria actually used to evaluate Plaintiff's performance could be critical to the joint employment inquiry, as the termination letter written by Mr. Reinkensmeyer notes Plaintiff's previous evaluation ratings. *See* Doc. 61, Ex. J. If Plaintiff's failure to meet County performance criteria led to her termination, then there is support for the finding of a joint employment relationship. The parties have left to the finder of fact the determination as to whether Plaintiff's termination was based on her unfavorable performance scores, and if so whether her supervisor based those scores at least in part on criteria set forth by the County.

Second, Plaintiff argues that the County sets minimum and maximum rates of pay for employees of MCSC. *See* Doc. 67 at 4. The County glosses over this contention in its Reply, cursorily noting that it "sets the salary ranges" for MCSC employees. (Doc. 76 at 2). While the County frames the issue in terms of human resources support of no broader significance, a market salary range cannot but help set an employee's salary. Mr. Reinkensmeyer's own testimony suggests that the County could, at least in theory, manipulate the market salary range to effectively price an employee out of accepting a position with, or continuing to work at, MCSC. *See* Doc. 68, Ex. D at 88–89. Similarly, Mr. Reinkensmeyer testified that MCSC employees were not, at the directive of the County, given merit pay increases for multiple years as a result of the County's dire budget situation. (*Id.* at 94–95). The County thus possessed some control over Plaintiff's salary under the third prong of the *Moreau* test.

In *Bonnette*, the Ninth Circuit found that an employment relationship existed in part

due to the alleged employer's "complete economic control over the relationship." 704 F.2d at 1470. It is apparently not in dispute that the County exercises considerable economic control over MCSC. The County argues that, while it acts as a lump-sum funding source for MCSC pursuant to state law, MCSC is part of the Judicial Branch of Arizona and its employees are State employees. The County also argues that because the determination of how to spend MCSC's budgetary allowance is ultimately overseen by a Presiding Judge who does not report to the County or its Board of Supervisors (the "Board"), its role as a funding source does not entail economic control.

Plaintiff does not dispute that the lump-sum funding allocation provided by the County is left to the specific expenditure discretion of MCSC. However, Plaintiff notes that the County's control over the size of the budget could and does affect MCSC operations and constitutes sufficient control over the nature and viability of Plaintiff's employment.

Funding disputes between Arizona counties and the superior courts are nothing new. One statute, with origins to 1901, seems at least to anticipate budgetary disagreement between a county and the superior court: "If a room for holding the court is not provided by the county, together with attendants, fuel, lights and supplies suitable and sufficient for the transaction of business, the court may direct the sheriff to provide them and the expenses shall be a county charge." Ariz. Rev. Stat. § 12-130(B). Indeed, the County points to no constitutional provision or statute which requires it to fund MCSC at a level higher than this statutory mandate, likely, because none appears to exist. At least in theory, if the Board wished to drastically reduce its appropriation to MCSC, there appears to be no legal hurdle preventing such a cut.

Arizona courts have dealt with budgetary gridlock between counties and superior courts before. In *Maricopa County v. Dann*, the Arizona Supreme Court held "that the courts are an independent branch of government, that they have control over their personnel, that they have a right to appoint necessary personnel to carry out the court's constitutional and statutory duties, and that boards of supervisors have the duty of approving personnel requests of the courts unless there is a clear showing that the judges acted unreasonably, arbitrarily,

or capriciously in making the request." 157 Ariz. 396, 398, 758 P.2d 1298, 1300 (1988). Yet the same opinion recognized that "an orderly fiscal policy is a governmental necessity and to order expenditures for personnel in excess of budget provisions might be unreasonable, arbitrary and capricious." *Id.* It thus appears that while MCSC is generally able to obtain what resources it needs, it might not always be in full control of what resources it is able to procure, especially in times of fiscal crisis. The possibility exists that the Board could determine MCSC's appropriation needs to be adjusted to fund only more necessary expenses.[3] The Board could even be justified in dramatically cutting MCSC's budget–and inherently, the ability to pay and retain many of its employees–if it could show good cause for doing so, possibly like sharply dropping tax revenue during an economic recession.

The Arizona Supreme Court later ruled that MCSC was bound by a County directive requiring a showing of necessity to fill positions during a hiring freeze. *Maricopa Cnty. v. Tinney*, 183 Ariz. 412, 413–14, 904 P.2d 1236, 1237–38 (1995). The court recognized that MCSC's circumvention of the Board is "an extreme measure" that ought to be used sparingly in order to preserve "our unique constitutional system of checks and balances among equal and independent branches of government"–a system wherein the Board, as the legislative branch of the County, determines how to spend public funds. *Id.* at 414, 904 P.2d at 1238. "[O]nly under extraordinary circumstances and as a last resort after reasonable avenues of cooperation and compromise have been exhausted" should the Presiding Judge issue an order to requisition employees, supplies, or additional funding from the County. *Id.* The court found that the County's showing of necessity requirement was reasonable and merited cooperation from MCSC. *Id.* at 413–414, 904 P.2d at 1237–38. Thus, while MCSC may be able to requisition what is necessary to transact business, it cannot do so in a vacuum. Rather, it is constrained by the political process to reasonably interact and cooperate with its

---

[3] The work of many individuals is required for a court to complete its business. However, when priority must be given to funding some positions over others, it is reasonable to expect that the salary of a judge or a court security officer will be paid ahead of that of a media relations director.

funding source, the Board. This complicated relationship between the County and MCSC constitutes some level of economic control sufficient for a fact-finder to find the existence of a joint employment relationship over Plaintiff. Accordingly, the County's Motion for Summary Judgment is denied.

### B. Defendant State of Arizona's Motion for Summary Judgment[4]

Plaintiff alleges that the State breached the ADA and the Rehabilitation Act when it failed to accommodate her medical condition and subsequently terminated her employment. Under the ADA, and correspondingly under the Rehabilitation Act,[5] Plaintiff must first establish that she has a disability. An individual is disabled if she "(1) has a physical or mental impairment that substantially limits one or more of [her] major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." *Coons v. Sec'y of the U.S. Dep't of the Treasury*, 383 F.3d 879, 884 (9th Cir. 2004). To demonstrate a prima facie case of employment discrimination, Plaintiff must additionally show that she is qualified–meaning she can perform the essential functions of her job with or without reasonable accommodation–and that her employer terminated her solely[6] because of her disability. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *see also* 29 U.S.C. § 794(a). "Making a prima facie showing of employment discrimination is not an onerous burden." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1091 (9th Cir. 2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If a plaintiff has made out a prima facie case of discrimination on the basis of such a disability, "[t]he burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment

---

[4] The County does not alternatively join the State's Motion for Summary Judgment.

[5] 29 U.S.C. § 794(d) provides that the standards used to determine a violation of the Rehabilitation Act in an employment context are the same as those used to determine a violation of the ADA.

[6] The Rehabilitation Act requires that the termination be *solely* as a result of the disability, while the ADA does not. The analysis proceeds using that qualifier because Plaintiff's ADA claim is barred by sovereign immunity.

- 9 -

action." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 n.3 (2003) (citing *McDonnell Douglas*, 411 U.S. at 802). If the employer is able to adduce evidence of such a nondiscriminatory rationale for the termination, "the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's evidence is pretextual." *Raytheon*, 540 U.S. at 50 n.3.

### 1. ADA Claim

In its Motion, the State contends that Plaintiff's ADA claim is barred by sovereign immunity. The states enjoy broad immunity from suit in federal court, as reinforced by the Eleventh Amendment. The Supreme Court has held that Congress did not validly abrogate state sovereign immunity when it enacted the ADA. *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001). Therefore, suits by private individuals against a state under Title I of the ADA for money damages are barred absent the state's consent. Because the State of Arizona has not consented to suit, Plaintiff cannot maintain an ADA claim against the State for money damages.[7] Summary judgment in favor of the State on Plaintiff's ADA claim is proper.

### 2. Discrimination under the Rehabilitation Act

The State is not similarly protected by sovereign immunity on the Rehabilitation Act claims, and Plaintiff is able to make out a prima facie case of discrimination.

#### a. Disability

First, Plaintiff must show that she suffers from a disability. The Ninth Circuit has held that depression, when it limits a major life activity, is a sufficient disability under the Rehabilitation Act. *See Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1174 (9th Cir. 1998). Plaintiff produces evidence, such as the expert deposition testimony of her physician, to demonstrate that she suffered from acute anxiety, depression, and panic attacks. *See, e.g.*, Doc. 69, Ex. B at 69–88. Defendant counters by noting that there was no formal diagnosis of depression until June 19, 2008. However, Dr. Klein testified that he had prescribed

---

[7] Plaintiff does not dispute this in her Response to the State's Motion.

- 10 -

Lexapro for Plaintiff in 2003 upon Plaintiff's complaint of symptoms of depression. (*Id.* at 27). Even though there were "[n]o severe symptoms of depression, suicidal thoughts, et cetera," Dr. Klein did note a "[d]efinite sense of joylessness" in the May 2003 appointment. (*Id.*). Just because a formal diagnosis may not have occurred until 2008 does not obviate the evidence provided by Plaintiff that her medical issues had possibly been occurring beforehand.[8] Plaintiff has put forth evidence that she has long suffered from depression and related mental illnesses, *see* Doc. 69, Ex. A at 243, and Dr. Klein's testimony verifies this for the period of time in which she was his patient. "[T]here are substantial issues of fact" whether, as of the date of her termination, Plaintiff "suffered from a temporary, nonchronic depression, or alternatively, a longer-term, more chronic condition which was nevertheless controllable by medication." *Mustafa*, 157 F.3d at 1174. The record thus contains a sufficient basis upon which a jury could find either a temporary condition that does not rise to the level of a disability or a longer-term condition which does. In any event, this is a factual determination.

An impairment, in turn, must substantially limit one or more major life activities to be considered a disability. In a statement submitted with her EEOC Charge of Discrimination, Plaintiff noted that, "[a]s a result" of her "acute anxiety and chronic depression," "sometimes I can barely get out of bed in the morning, I can barely dress myself, I cannot do any household chores, I cannot recreate, and I cannot maintain my concentration." (Doc. 61, Ex. EE). Plaintiff reiterated these limitations at her deposition. *See* Doc. 69, Ex. A at 120–24. "Federal regulations describe major life activities as including functions 'such as caring for oneself, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1061 (9th Cir. 2005) (citing *Fraser v. Goodale*, 342 F.3d 1032, 1039 (9th Cir. 2003) (quoting 45 C.F.R. § 84.3(j)(2)(ii); citing 29 C.F.R. § 1630.2(I))) (emphasis omitted)). Moreover, "[t]o be a major life activity,

---

[8] Plaintiff testifies that she was first diagnosed with depression sometime around 2002 or 2003. (Doc. 69, Ex. A at 44). Whether this is true, and to what extent Plaintiff had mental and emotional illness at that time, are questions for a fact-finder.

the activity need not be essential to survival, but rather 'of central importance to most people's daily lives.'" *Id.* at 1061–62 (quoting *Fraser*, 342 F.3d at 1040).

Under these criteria, getting out of bed in the morning, dressing oneself, and maintaining one's household can be considered major life activities. *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 202 (2002) (superseded by statute on other grounds) ("[H]ousehold chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives . . . ."); *EEOC v. United Parcel Serv., Inc.*, 249 F.3d 557, 562–63 (6th Cir. 2001) (holding that there was sufficient evidence for a jury to find that a plaintiff suffering from severe allergies who spent nearly all his non-working hours in bed was substantially limited in the major life activity of caring for himself). This is particularly so given the nature of the impairment in question, depression. In *Head*, the Ninth Circuit found the plaintiff's allegation–that his ability to think was impaired by an inability to concentrate resulting from "bipolar disorder and/or depression"–to be sufficient evidence of impairment of a major life activity to survive summary judgment. 413 F.3d at 1061. The court further held that reading, which Plaintiff here also contends she is unable to do as a result of her depression-induced inability to concentrate, *see* Doc. 69, Ex. A at 123, is a major life activity. *Head*, 413 F.3d at 1061–62. From the record here, Plaintiff has identified sufficient evidence of major life activities which may have been limited by her impairment. Plaintiff must next show sufficient evidence to establish a causal link between the impairment and the limitation of major life activities. The Ninth Circuit has held that, at the summary judgment stage, a plaintiff need not provide "comparative or medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity," because "a plaintiff's testimony may suffice to establish a genuine issue of material fact." *Id.* at 1058. While "an affidavit supporting the existence of a disability must not be merely self-serving and must contain sufficient detail to convey the existence of an impairment," *id.* at 1059, Plaintiff has sufficiently created an issue of fact that her difficulty concentrating impaired her from engaging in many of her life's meaningful pursuits. The following testimony by Dr. Klein corroborates Plaintiff's theory on the link between

depression, concentration, and life activities: "When people are depressed, it's hard to concentrate, it's hard to think. They maybe have problems controlling their emotions and cry, have problems with relationships with other people that they work with. Any number of ways." (Doc. 69, Ex. B at 78). Plaintiff provides sufficient evidence that she has an impairment which limits at least one major life activity. Therefore, there is an issue of material fact with regard to Plaintiff's disability status.

### b. **Qualified**

To prove that she is qualified, Plaintiff must "show that [she] can perform the 'essential functions' of the job'" with or without reasonable accommodation. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (citations removed); *see also Kennedy*, 90 F.3d at 1481. Such "essential functions" are "fundamental job duties of the employment position . . . not includ[ing] the marginal functions of the position." *Bates*, 511 F.3d at 990 (citing 29 C.F.R. § 1630.2(n)(1)) (internal quotations removed). Determination of these essential functions "is a factual finding." *Id.* at 992 n.7. Furthermore, "[a]lthough the plaintiff bears the ultimate burden of persuading the fact finder that he can perform the job's essential functions . . . 'an employer who disputes the plaintiff's claim that [she] can perform the essential functions must put forth evidence establishing those functions.'" *Id.* at 991 (quoting *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 568 (8th Cir. 2007)).

The State does not argue that Plaintiff could not perform the essential functions of her position with or without reasonable accommodation. Because the Ninth Circuit shifts the burden of production to an employer challenging an employee's qualified status, and because the State has neither directly challenged Plaintiff's ability to perform the essential functions of her position with or without reasonable accommodation, nor has it produced any evidence as to what those essential functions are, summary judgment on this point would be inappropriate.

### c. **Termination Caused Solely by the Disability**

The prima facie case of discrimination under the Act finally requires that the adverse employment action–here, termination–occurred "solely by reason of her . . . disability." 29

U.S.C. § 794(a). Plaintiff has supplied evidence that she suffered from depression, anxiety, and panic attacks, and that these conditions caused her to lose her concentration. This in turn, she maintains, led her job performance to suffer, for which she was eventually terminated. Plaintiff and the State appear to agree that Plaintiff's performance deficiencies were the immediate reason for her termination. Nowhere in its Motion does the State allege that Plaintiff's disability was not the cause of these deficiencies, nor does the State argue that Plaintiff cannot point to an issue of material fact with regard to causation. *See Fitzsimmons v. City of Phx.*, 2008 WL 2225764, at *1 n.2 (D. Ariz. 2008) (refusing to consider whether plaintiff could prove that he had a qualified disability because defendant's motion for summary judgment identified only a general denial rather than any specific evidence on the issue). Because Plaintiff has introduced evidence of a causal link between her disability and her termination, *see discussion supra* section II.B.2.a, and the State has not seen fit to argue otherwise,[9] summary judgment is unwarranted with regard to causation.

### d. Burden Shifting

Because Plaintiff has demonstrated a prima facie case of discrimination under the Act, the burden of production shifts to the State "to articulate a legitimate, nondiscriminatory reason for its employment action." *Raytheon*, 540 U.S. at 50 n.3 (citing *McDonnell Douglas*, 411 U.S. at 802). The State repeatedly points to Plaintiff's "performance problems" at various points in time to justify the termination. (Doc. 62 at 10). Its argument is that prior performance deficiencies were noted and disciplinary actions taken before the State became aware of Plaintiff's disability, and therefore the termination could not possibly have been due to the disability. While it may be true that Plaintiff received poor performance reviews and was even once demoted before the State knew of her disability, Plaintiff produces evidence

---

[9] The State does address the causation prong of the prima facie case in its Reply. Its belated argument, if even given consideration by the Court (*see Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are waived.")), is not dispositive. While it may be true that the State did not know of Plaintiff's claimed disability for some time, there is evidence in the record that the State knew of such a disability when it terminated her.

- 14 -

to demonstrate that the State was aware of her mental health problems by the time of her termination. The State's earlier lack of knowledge that Plaintiff's performance problems may have been caused by her disability does *not* equate to a lack of knowledge at the time of termination that Plaintiff suffered from a disability which may have caused those problems.

Accordingly, the State fails to show that there is no material fact with regard to a nondiscriminatory rationale for the termination when Plaintiff has raised factual issues of a causal link between the disability and those performance problems. "An employer relies on a disability when it justifies termination based on conduct caused by the disability." *Fitzsimmons*, 2008 WL 2225764, at *2 (citing *Teahan v. Metro-North Commuter R.R. Co.*, 951 F.2d 511, 516 (2d Cir. 1991)). Furthermore, "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139–40 (9th Cir. 2001). In light of Plaintiff's prima facie case of discrimination under the Act, a jury could reasonably find that there was a causal link between Plaintiff's depression (and related illnesses) and her performance problems at work. *See id.* at 1140 ("[A] jury could reasonably find the requisite causal link between a disability . . . and [the employee's] absenteeism and conclude that [the employer] fired [the employee] because of her disability."). The State thus fails to satisfy its burden of demonstrating a nondiscriminatory rationale for the termination which does not rely on the very underlying disability in question. Therefore, with respect to the discrimination claim under the Rehabilitation Act, the State's Motion for Summary Judgment is denied.

### 3. Failure to Accommodate under the Rehabilitation Act

Failure to accommodate a disability occurs when an employer fails to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. §

12112(b)(5)(A).[10] Such reasonable accommodations include, as relevant here, "job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . appropriate adjustment or modifications of examinations, training materials or policies . . . and other similar accommodations . . . ." 42 U.S.C. § 12111(9)(B). Plaintiff has already raised an issue of material fact that she has a disability and is qualified–that is, that she can complete the essential functions of her job with or without reasonable accommodation. "If accommodation [of] their handicap is required to enable them to perform essential job functions, then plaintiffs must only provide evidence to make 'at least a facial showing that reasonable accommodation is possible.'" *Buckingham v. United States*, 998 F.2d 735, 740 (9th Cir. 1993) (quoting *Arneson v. Heckler*, 879 F.2d 393, 396 (8th Cir. 1989)).

Plaintiff has made such a showing. In her testimony regarding her inability to concentrate, she noted that she was able, following a workflow modification within the media relations office, to continue completing her responsibilities. (Doc. 69, Ex. A at 145). A jury could infer from this adjustment that there were other ways in which MCSC could have reasonably accommodated Plaintiff's workload to account for her reduced ability to concentrate as a result of her disability. Plaintiff further notes that she was willing to accept another job at MCSC, even if it meant doing lower-level secretarial work. (*Id.* at 256). Moreover, Plaintiff maintains that at her final meeting with Mr. Reinkensmeyer, she requested a transfer to another position. (*Id.* at 253, 264). Plaintiff has pointed to enough evidence of the possibility of reasonable accommodation to meet her initial burden of production.

An employer has a higher burden under the Act. It is not enough to "merely speculate that a suggested accommodation is not feasible," but instead the employer "has a duty to 'gather sufficient information from the applicant and qualified experts as needed to determine what accommodations are *necessary* to enable the applicant to perform the job . . . .'"

---

[10] This definition comes from the ADA, which applies to the determination of alleged violations of the Rehabilitation Act pursuant to 29 U.S.C. § 794(d).

*Buckingham*, 998 F.2d at 740 (quoting *Mantolete v. Bolger*, 767 F.2d 1416, 1423 (9th Cir. 1985)) (emphasis in original). In essence, once an employer becomes aware that an employee might need an accommodation, it "has a *mandatory* obligation . . . to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey*, 239 F.3d at 1137 (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000)) (emphasis added).

The State's main defense is that it was unaware of Plaintiff's disability and therefore could not have known it had a duty to accommodate her. But Plaintiff produces evidence that, at various points leading up to her eventual termination, she provided MCSC with notice that her job performance was suffering due to her depression and related illnesses. First, Plaintiff maintains that in a January 2008 meeting she notified Ms. Funkhouser that she "was suffering from a disability because of severe depression, panic attacks and anxiety and . . . told her that [she] felt [she] needed an accommodation because of this disability," to which she received no response. (Doc. 69, Ex. A at 127). Ms. Funkhouser denies this, *see* Doc. 61, Ex. E at 92–93, but only a finder of fact can weigh the evidence and the credibility of the witnesses to determine whether Plaintiff requested an accommodation in January 2008.

Future communications were more explicit regarding a request for accommodation. Plaintiff's counsel sent a letter to Mr. Reinkensmeyer, dated June 20, 2008, which notified him that Plaintiff was "suffering from acute anxiety and chronic depression" and specifically alleged that the MCSC "is violating Ms. Brown's rights under the Americans with Disabilities Act by refusing to accommodate her disability." (Doc. 69, Ex. H). Next, Plaintiff's counsel wrote to the State's counsel on August 26, 2008, ahead of Plaintiff's return from FMLA leave, asking to "commence engaging in the interactive process required by the ADA in order to give the Superior Court the opportunity to accommodate Ms. Brown's disability." (Doc. 69, Ex. I). Finally, Plaintiff herself maintains that she wrote a letter to Mr. Hanley on September 15, 2008–in response to his letter of one week prior wherein he requested additional information regarding her desire for accommodation, *see* Doc. 61, Ex. U–wishing to "sit down with [him] to discuss what type of accommodation

would help [her] continue with [her] work at the Court." (Doc. 69, Ex. C). Mr. Hanley's claim that he never received the letter, *see* Doc. 61, Ex. V at 92, also creates a factual dispute to be resolved by a jury. In short, Plaintiff has included sufficient evidence that she notified her employer of her disability and her intentions to seek accommodation. An issue of material fact remains whether Plaintiff's notifications were enough to begin the "interactive process" and whether any action taken by the State was sufficient to meet its own burden to provide accommodations. Summary judgment is therefore denied with respect to the failure to accommodate claim.

**CONCLUSION**

There is an issue of material fact whether the County was Plaintiff's joint employer. Plaintiff's ADA claim against the State is barred because the State has not waived its sovereign immunity. Sufficient factual issues exist with regard to the Rehabilitation Act discrimination and failure to accommodate claims against the State to defeat summary judgment.

**IT IS THEREFORE ORDERED** that Defendant Maricopa County's Motion for Summary Judgment (Doc. 59) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant State of Arizona's Motion for Summary Judgment (Doc. 62) is **GRANTED IN PART AND DENIED IN PART**. The Motion is granted with respect to the ADA claim and denied on the Rehabilitation Act claims.

DATED this 20th day of July, 2011.

G. Murray Snow
United States District Judge